UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DR. EILEEN CALLAWAY,

     Plaintiff,

v.                       Case No.:  2:19-cv-745-SPC-MRM

LEE MEMORIAL HEALTH
SYSTEM,

     Defendant.

_____/

## OPINION AND ORDER[1]

Before the Court is Defendant Lee Memorial Health System's Motion for Summary Judgment (Doc. 56).  Plaintiff Eileen Callaway responded in opposition (Doc. 64), to which Lee Health replied (Doc. 66).  The Court grants the Motion.

## BACKGROUND

Eileen Callaway is a former student of Florida State University's medical residency program and resident physician with Lee Health.  Callaway alleges that she experienced disability discrimination and was retaliated against for objecting to disability discrimination.  She also alleges she was retaliated

[1] Disclaimer: Documents hyperlinked to CM/ECF are subject to PACER fees.  By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them.  The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this Order.

against for taking job-protected leave and that her right to leave was interfered with.

In 2011, Lee Health and Florida State University College of Medicine entered an Affiliation Agreement to put a family medicine residency program in place at Lee Health facilities and to staff that program with FSU students. (Doc. 50-21).  FSU developed the program, ran the residency, and maintained accreditation, and, after ensuring that the residents met all requirements, presented them with a diploma.  Lee Health provided the clinical facilities and other support.  Dr. Gary Goforth started at FSU as the Program Director in 2012.  The Program requires three years of training at local hospitals and community physician offices.  The Program took its first resident in 2014.

Following medical school, Callaway spent a year as a surgical resident at Wayne State University at Detroit Medical Center.  In the summer of 2015, she transferred to be a family medicine resident in FSU's Medical Residency Program and entered into a Resident Training Agreement—a three-party agreement between Callaway, Lee Health, and FSU.

There are two components to graduate from FSU's Medical Residency Program in compliance with accreditation standards: a two-year continuity requirement, and 1650 continuity-care patient visits.  As Program Director, Goforth determined how many transfer credits Callaway received.  The number of transfer credits Callaway received was not settled right away.  In

2017, Wayne State provided a letter stating that Callaway had over 800 patient visits while there.  (Doc. 64-2).  Because patient encounters for a surgical residency differ from those in a family medicine program, Goforth gave Callaway credit for 150 patient visits—the average patients a first-year resident in a family medicine program sees.  Goforth also gave her six-and-a-half month's credit for the surgery program she came from.

Callaway testified about two other residents that transferred from Wayne State and allegedly received more credit than her.  First, Chelsey Scheiner, who was a urology resident with a similar first-year surgical rotation schedule, received transfer credit for 600 patient visits.  Goforth testified that he would "never" have given her that much transfer credit.  Second, Callaway believed that Roy, who had time in both emergency medicine and anesthesiology, received transfer credit for 1000 patient visits.  But Callaway presents no affirmative evidence showing that Scheiner and Roy received the credits she alleges.

To work as a resident at Lee Health, Callaway had to be enrolled in FSU's Medical Residency Program.  Goforth had approval discretion over whether Callaway continued in the program.

During the first months there, Callaway had performance issues.  In October 2015, she scored poorly on an annual in-training exam that assesses how the resident would perform on the board certification exam taken at the

end of their residency.  Callaway attributes the low score to the fact that the morning of the test she received news that a family member was involved in a horrific accident.  Because of the low score, FSU placed her on a "remediation plan" through March 2016.  (Doc. 59-3).  The plan set forth goals such as improving certain required test scores to at least the minimum passing level, improving efficiency on inpatient services, and improving her skills related to patient encounters.  She says other residents failed the exam and were not placed on a remediation plan, but she offers no evidence to support that claim. Callaway denies there were deficiencies in her performance, other than she took longer to complete certain tasks because she suffers from attention deficit disorder.

At the end of the remediation period, Callaway met many goals, but she remained below her expected level based upon years of training, and so the remediation period was extended through May 2016.  Even so, Goforth determined that she was eligible for a promotion.  She took the in-training exam again at the end of the remediation period and received a perfect score, but Goforth questioned its validity because of how quickly the score jumped and how quickly she finished the test.  The test was an old test available online and he suspected that Callaway had reviewed the test beforehand.

Despite performance issues, in February 2017, Lee Health extended Callaway an offer to work as a physician in their Bonita Bay office after

completing her residency, beginning in January 2018.  Lee Health and Callaway signed an employment agreement.  (Doc. 59-5).

In June 2017, Callaway received verbal counseling for multiple issues, including lack of professionalism, lack of clinic volume, and efficiency, which were memorialized in a memorandum of record.  (Doc. 59-6).  She was warned that further actions may cause her dismissal from the Program.

The next month, Callaway was placed on an "academic enhancement plan" for clinical efficiency and professionalism.  (Doc. 59-7).  She was behind in the clinic encounters required to graduate from the residency program.

Later that month, Callaway received another verbal counseling because she left after a resident meeting without telling anyone and did not respond to messages until the next day.  She also failed to show to present a lecture where multiple residents and faculty were in attendance.  The verbal counseling is memorialized in a memorandum of record.  (Doc. 59-8).  According to the memo, Callaway told Goforth she has been dealing with major depression and had to lie down after the resident meeting because of medication side effects.  It appears this was the first time FSU learned of her depression.  At her deposition, Callaway testified that she missed the lecture because she was having neck spasms from the medications she was taking and had taken Benadryl.  Goforth told her she must take FMLA time away from the program to deal with her personal medical issues.  He told her to use FMLA leave to

take off at least two weeks and ideally four weeks, but she could use FMLA leave for up to 12 weeks, if necessary.  The memo reads: "Prior to returning to work, she is advised that her provider(s) need to send a letter indicating that she is capable of caring for patients and managing her personal affairs as well as being medically stable." (Doc. 59-8).  Callaway says that she was forced to take this FMLA leave.  Still, she testified that Lee Health allowed her to take her requested FMLA leave and denied none of her FMLA requests.  She testified she took the full 12 weeks of FMLA leave.

Goforth told Callaway she should contact Lee Health and tell them she may not work for them in January 2018 since her residency completion would be delayed by at least one month because of leave.

In September 2017, Callaway submitted a Request for Accommodation seeking accommodations due to ADD and major depression.  (Doc. 59-16). LMHS granted various accommodations.  (Doc. 59-17).  She felt she was being harassed, discriminated against, retaliated against, and not accommodated. She complained to Lee Health and FSU.

On October 6, 2017, Lee Health rescinded the conditional offer of employment.  The letter stated the offer was rescinded "because your graduation date has been moved months later than originally planned" and that Lee Health "could not accommodate the change in start date due to more immediate staffing needs." (Doc. 59-10).  Dr. Venkat Prasad, Lee Health's

Chief Medical Officer, testified that the contract was rescinded because Callaway could not meet the job requirements, including completion of the FSU program and medical staff privileging and credentialing because she was not board eligible or board certified.   Lee Health consulted Goforth before rescinding the offer.   Goforth told Prasad that Callaway remained inefficient, ordered excessive tests, and worked up rare disorders.   (Doc. 65-1 at 78). Prasad said this, along with other conversations, would have led to his decision to rescind the offer.   Prasad's Declaration states that once a resident is suspended or terminated from a residency program, the resident can no longer work for Lee Health.  (Doc. 59-2).

In October and November 2017, Callaway received academic enhancement plans related to clinical efficiency, clinic numbers, and professionalism.   In December 2017, Callaway received another verbal counseling for inappropriate language in a patient's medical record and an outburst at a monthly resident meeting.  She was placed on formal probation and referred to the Professional Resource Network (PRN) "given the multiple concerns for medical knowledge deficit, questionable clinical decision[-]making skills and professionalism, in conjunction with the recent patient documentation concern and behavior at the resident meeting." (Doc. 59-14). On the Referral Form, Goforth checked "Behavior (Disruptive, Anger Management, Mental Health" as the reason for referral.  He also detailed the

reasons for the referral, starting with that she had been counseled many times since January 2016 for multiple issues.  The referral concluded:

> Dr. Callaway does have a private psychiatrist and psychologist who sees her about one time per week.  She was away from the residency program from 7/17/2017 to 9/25/2017 in order to obtain treatment from her mental health professionals.  Dr. Callaway requested ADA accommodations on her return which we have implemented.  Since we have not seen any significant improvement in Dr. Callaway's behavior after spending over 2 months away to work with her private mental health professionals, we need the Florida PRN's assistance in an effort to maximize Dr. Callaway's opportunity to complete her residency training (projected completion on March 5, 2018 if she is able to return to work soon).

(Doc. 59-18).  Callaway testified that she was forced to go to PRN as Goforth told her she could either quit or undergo a psychiatric evaluation by PRN.  She felt she was "guilty by being referred to them" and the PRN process was a "nightmare."  That same month, Callaway detailed a formal grievance against Goforth and others in an email to Dr. Eric Goldsmith, academic director at Lee Health.  (Doc. 65-2).  Goforth responded to the complaints.

After evaluation in January 2018, PRN found Callaway was "NOT able to practice her profession with reasonable skill and safety at this time without compliance with PRN monitoring" and only after she fully complied with the terms of the PRN monitoring agreement for at least 30 days of uneventful monitoring may she return to practice.  (Doc. 56-1 at 7).  Callaway did not agree with the accuracy of PRN's findings and never signed the PRN monitoring

agreement.  She testified she could not return to work because she would not sign the contract for monitoring with PRN.

Although not cleared to return to work because she refused to sign the PRN contract, she requested non-FMLA health leave between January 5, 2018, and March 30, 2018, which Lee Health granted.  When approved, Lee Health told her that if she could not return to work it would be considered her voluntary resignation.  (Doc. 59-20).

PRN informed Goforth it had not released Callaway to return to work. Because she failed to complete the PRN (and therefore could not provide a date she would return to work), she was terminated from FSU's Family Residency Program and Lee Health terminated her employment on May 9, 2018.

In all, Callaway was on continuous FMLA leave from July 31, 2017 to October 2, 2017 (about 9 weeks).  At the end of August 2017, Callaway contacted Lee Health and said she needed four more weeks of FMLA leave to deal with her illness.  (Doc. 65-1 at 74).  She returned to work October 3, 2017. After returning from her initial continuous FMLA leave in October, her request for intermittent FMLA leave from October 19, 2017, to April 18, 2018, was approved.  She received continuous FMLA leave from December 15, 2017, to January 4, 2018.  She exhausted her 12 weeks of FMLA leave on January 4, 2018.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a material fact is in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden to show the lack of genuinely disputed material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If carried, the burden shifts onto the nonmoving party to point out a genuine dispute. *Beard v. Banks*, 548 U.S. 521, 529 (2006). At this stage, courts view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

## DISCUSSION

### A. FMLA Interference

The FMLA provides up to 12 weeks of unpaid leave annually to recover from "a serious health condition that makes the employee unable to perform the functions" of her position. 29 U.S.C. § 2612(a)(1)(D). "To establish a claim of FMLA interference, 'an employee need only demonstrate by a preponderance

of the evidence that he was entitled to the benefit denied.'" *Vira v. Crowley Liner Servs., Inc.*, 723 F. App'x 888, 895 (11th Cir. 2018) (quoting *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001)).  For interference, the employee "does not have to allege that his employer intended to deny the right; the employer's motives are irrelevant." *Strickland*, 239 F.3d at 1208.

Lee Health argues that Callaway's interference claim cannot survive because the record shows she took 12 weeks of FMLA leave, her FMLA protected leave was exhausted on January 4, 2018, and she admits that Lee Health did not deny her FMLA leave.  Callaway responds that she is asserting an involuntary-leave claim.  That is, that Lee Health, itself and through Goforth, interfered with her FMLA rights when it forced her to go on involuntary FMLA leave.  Thus her 12-weeks of FMLA leave she was entitled to was used up and gone when she wanted to take it.  As Callaway recognizes, the Eleventh Circuit has not yet addressed whether an involuntary-leave theory is actionable under the FMLA.  *See Grace v. Adtran, Inc.*, 470 F. App'x 812, 816 (11th Cir. 2012).  Lee Health argues that the Court should not consider the involuntary-leave theory because it is neither pled nor recognized by the Eleventh Circuit.

Callaway has failed to show she was denied a benefit she was entitled.  Lee Health granted her 12 weeks of FMLA leave, her FMLA protected leave

was exhausted on January 4, 2018, and she admits that Lee Health did not deny her FMLA leave. And construing the Complaint liberally and considering the involuntary-leave theory, the Court will not break step with the Eleventh Circuit and adopt the theory because, as in *Grace*, such a claim would not be ripe for review. "The only circuit to adopt a voluntary leave theory has determined that an employee's claim 'ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past.'" *Grace*, 470 F. App'x at 816 (quoting *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007)). Here, Callaway did not request additional FMLA leave that was denied after Lee Health allegedly forced her to take FMLA leave. Thus, even if the involuntary leave theory were viable, Callaway's claim would not be ripe.

### B. FMLA Retaliation

For retaliation claims, "an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001). In other words, there must be intent to retaliate. *Id.* When (as here) a plaintiff offers no direct evidence of retaliation, courts employ the *McDonnell*

*Douglas* framework.[2] *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  Lee Health and Callaway agree that *McDonnell Douglas* applies, and Callaway hinges her argument on pretext.  (Doc. 64 at 14-15).  She argues that temporal proximity, statements by Goforth she had missed so much time she could never graduate, and the reasons offered by Lee Health for referring her to PRN support pretext.

A plaintiff must show: "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to a protected activity."  *Pereda v. Brookdale Senior Living Cmty., Inc.*, 666 F.3d 1269, 1275 (11th Cir. 2012) (citation omitted).  Only the last prong is disputed.   A causal relationship means "the relevant decisionmaker was aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated."  *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) (internal quotation marks and citation omitted).

Typically, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."  *Brungart v. BellSouth Telecomm.'s, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

As it relates to the causation prong, temporal proximity is "measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Gulf Coast*, 854 F.3d at 1272.

Once an employee establishes a *prima facie* case of retaliation, "the burden shifts to the employer 'to articulate a legitimate reason for the adverse action.'" *Martin v. Brevard Cty. Pub. Schs.*, 543 F.3d at 1268 (quoted authority omitted). "If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Id.*

The timing between Callaway's return from FMLA leave (January 4, 2018) and her termination (May 9, 2018) was four months. Such a gap has been found to be too attenuated to establish a causal connection. *See, e.g.,* *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."); *Penaloza v. Target Corp.*, No. 8:11-cv-2656-T-33AEP, 2012 WL 6721011, at *14 (Dec. 27, 2012) (finding that the Eleventh Circuit has held that without additional evidence, an adverse employment action taken three months after protected activity is not proximate enough to show causation).

Even if four months is a close enough temporal proximity to establish a causal connection, Callaway would still fail to establish causation because Lee Health had a legitimate business reason for terminating her employment. An "employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons.'" *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citation omitted). Rather, the reason must simply be "one that might motivate a reasonable employer." *Id. at 1030*.

Lee Health contends it terminated Callaway because she was terminated from the FSU Residency Program (a condition to employment as a resident at Lee Health), she was not board certification eligible, and she could not fulfill the conditions precedent to the Bonita Bay Employment Agreement, which are wholly unrelated to FMLA. Goforth decided to terminate Callaway's participation in the FSU Family Residency Program because she failed to complete the PRN requirements (including signing the PRN monitoring agreement) and therefore could not complete the Program. Terminating an individual's employment for failing to fulfill a requirement of the job (to remain enrolled in the Program) is a legitimate reason to fire someone. The Court is not here to second guess FSU's PRN policy. Every employer has the "right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th

Cir. 1984).  An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id.*

After defendant provides an acceptable reason, the burden again reverts to plaintiff for a showing "that the supposedly legitimate reason was in fact a pretext designed to mask illegal discrimination." *Gulf Coast*, 854 F.3d at 1271. "To show pretext, [plaintiff] must 'come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Id.* at 1274 (quoting *Chapman*, 229 F.3d at 1024).    Whether the employer's decision was wise or fair is irrelevant. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  Instead, the pretext inquiry "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atlantic Dev., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). So "quarreling with the wisdom" of the reason will not do. *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted).

"A reason is not pretext for retaliation 'unless it is shown *both* that the reason was false, *and* that retaliation was the real reason.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F3d 1121, 1136 (11th Cir. 2020) (en banc) (alterations accepted) (quoted authority omitted).  To do so, the "employee must

meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. Evidence "significantly probative" of pretext is necessary. *Brooks*, 446 F.3d at 1163 (citation omitted). One can "establish pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Gulf Coast*, 854 F.3d at 1274 (citation omitted).

Callaway argues only one point on pretext—"the reasons offered by Defendant for referring her to PRN (the alleged 'outburst' in the residents meeting, and a single patient complaint about adding information to a medical records) were pretextual." (Doc. 64 at 15). But Lee Health did not refer Callaway to PRN. Goforth, as Program Director for FSU, did.[3] Callaway has submitted no evidence that Lee Health knew of the reasons she was referred to PRN. Indeed, Dr. Goldsmith, head of academic programs at Lee Health, knew about the referral, but did not recall speaking with Goforth about why she was referred. And there is no evidence that Lee Health knew of the alleged "outburst" in the resident meeting and the single patient complaint.

---

[3] Callaway tried to join FSU as a party two years after this case was filed. The Court denied that request. (Doc. 54).

Even if Lee Health were involved with the decision to refer Callaway to PRN, Callaway has not shown that the reasons for referring her to PRN were false and that retaliation was the real reason.  Professionalism concerns with Callaway's performance began early in her residency, long before Lee Health knew of her disability and before she went on FMLA leave and continued until her termination.  And she was referred to PRN to maximize her opportunity to complete the residency program.

Callaway fails to show that Lee Health's reasons for terminating her were inconsistent, implausible, or contradictory.  Once Callaway was terminated from the FSU Family Residency Program, she was ineligible to keep working as a resident for Lee Health.  There is no other evidence in the record supporting a reasonable inference of FMLA retaliation.  In fact, there is no evidence that Lee Health had any problem with her FMLA leave, which was apparently approved without an issue.  And she concedes that Lee Health did not deny her any leave under FMLA and granted her request for continued leave.  Because Callaway failed to carry her burden on pretext, her retaliation claim fails.

### C. ADA and FCRA Disability Discrimination[4]

Title VII's employment discrimination burden-shifting framework applies to ADA claims. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). Callaway must prove three elements for her *prima facie* case of disability discrimination: "(1) [s]he is disabled; (2) [s]he is a qualified individual; and (3) [s]he was subjected to unlawful discrimination because of h[er] disability." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007); *see also* 42 U.S.C. § 12112(a). The second and third prongs are disputed.

To establish the second prong of her *prima facie* case, Callaway must show she is a "qualified individual" for the job. 42 U.S.C. § 12112(a). A qualified individual is a disabled person "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). "The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

---

[4] The FCRA claims are analyzed under the same standard as the ADA claims. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255 (11th Cir. 2007).

Lee Health argues that Callaway cannot show she was a qualified individual because she was terminated from the FSU Family Residency Program—a condition of her employment as a resident with Lee Health. Callaway mentions this prong in a footnote to her response saying that because Lee Health provided her leave up to her termination, she must have been a qualified individual. (Doc. 64 at n.42). This argument doesn't win the day. The Court agrees with Lee Health that once FSU determined Callaway could no longer participate in the Program (a prerequisite to participating in Lee Health's residency program), she was not longer a qualified individual for the residency position with Lee Health.

As for the third prong, Lee Health argues there is no evidence Callaway's termination related to any actual or perceived disability. In response, Callaway states,

> Plaintiff was discriminated against by being singled out for different treatment, held to different standards for graduation, denied patient encounter credits that would have fulfilled her quota for graduation, and denied her diploma, resulting in loss of employment opportunities, mental anguish, and ineligibility to become a Board Certified physician. She has demonstrated that other residents in the Program who were not either disabled or perceived as disabled received significantly more transfer patient encounters credit, were held to a different standard to receive their diploma, and were not placed on involuntary leave for missing a lecture or for discussing the terms and conditions of their employment with other residents. There is sufficient evidence for a jury to conclude that the damages suffered by Plaintiff were caused not by her own actions but by Defendant's discriminatory treatment.

(Doc. 64 at 15-16).

Callaway cites no evidence in the record to support these factual contentions, which is required. *See* Fed. R. Civ. P. 56(c). And Callaway identifies no other similarly situated employees absent for longer periods who did not face termination. A plaintiff "must show that she and her comparators are similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1226 (11th Cir. 2019) (en banc) (internal quotation marks omitted). Comparators should have (1) "engaged in the same basic conduct (or misconduct)"; (2) "been subject to the same employment policy, guideline, or rule"; (3) usually (but not always) "been under the jurisdiction of the same supervisor"; and (4) a similar "employment or disciplinary history." *Id.* at 1227-28.

Callaway mentions Scheiner and Roy as comparators but offers no evidence they were similarly situated in all material respects to conclude that they are valid comparators. While a plaintiff's "self-serving statements based on personal knowledge or observation can defeat summary judgment," *United States v. Stein*, 881 F.3d at 853, 857 (11th Cir. 2018), it does not stand when based on conclusory allegations or blatantly contradicted by the record, *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013). Callaway identifies no residents who were suspended or terminated from

FSU's Medical Residency Program and who were not suspended or terminated by Lee Health. She has identified no comparators who returned to work without completing a PRN program after a referral.

Even if Callaway could establish a *prima facie* case of disability discrimination, Lee Health cites to record evidence supporting legitimate, nondiscriminatory reasons for her termination. Lee Health terminated Callaway because she did not complete the FSU Residency Program (a condition to employment as a resident at Lee Health) and was not cleared by PRN.

"If an employer proffers more than one legitimate nondiscriminatory reason, the plaintiff must rebut each reason to survive a motion for summary judgment." *Cappetta v. N. Fulton Eye Ctr.*, 713 F. App'x 940, 943 (11th Cir. 2017). Callaway provides no argument on pretext in her response, but in any event, as discussed above, she has not shown that the reasons for her termination were pretext.

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Because Callaway fails to show she is a qualified individual who was subjected to unlawful employment

discrimination—essential elements of her discrimination claim—summary judgment is granted on the claim.

### D. ADA and FCRA Retaliation

The ADA prohibits retaliation "against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). This prohibition is analyzed "under the same framework ... employ[ed] for retaliation claims arising under Title VII." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Accordingly, "[t]o establish a *prima facie* case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action." *Id.* Only the third prong of the *prima facie* case is disputed.

Callaway cannot satisfy the third prong. She alleges she was retaliated against for requesting accommodations for ADD and major depression and filing a complaint of hostile work environment, both in September 2017. She alleges five adverse actions were taken against her in retaliation for protected activity: (1) the first involuntary FMLA leave in July 2017; (2) the rescission of the Bonita Bay Employment Agreement in October 2017; (3) the referral to PRN and the second involuntary FMLA leave in December 2017; (4) refusal to release her diploma to her despite her meeting all criteria for graduation (including the patient encounters she was not given credit for); and (5)

termination of her employment at Lee Health.  (Doc. 64 at 17).  She argues the reasons for these adverse actions were pretextual.

The first alleged adverse action was taken in July 2017, which his before Callaway made the accommodation request in September 2017.  Logic tells us that the adverse action cannot result from an accommodation request not yet made.  *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2005) ("[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.").  As for the other adverse actions, there is simply no causal link and the timing doesn't support causation.  Lee Health rescinded the job offer because she would not complete the Program, Lee Health was not involved with the decision to refer her to PRN, and Lee Health did not refuse to release her diploma.  And all the protected activity occurred before her departure on leave in December 2017 and she was not terminated until May 2018.  *See Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough.")

As discussed above, even if Callaway could establish a *prima facie* case of disability discrimination, Lee Health cites to record evidence supporting

legitimate, nondiscriminatory reasons for her termination and Callaway has not shown pretext.

In sum, Callaway has failed to present sufficient evidence that her protected activity was a factor in her termination to create a genuine issue of material fact for trial.

### E. Breach of Contract

The only contract alleged in the Complaint is the Bonita Bay Employment Agreement under which Callaway was supposed to work for Lee Health beginning in January 2018 after completing the FSU's Medical Residency Program. Even so, Callaway, through deposition testimony, says that she is alleging breach of *two* contracts in this action—the employment agreement and the Resident Training Agreement. But Callaway did not plead a breach of both contracts and the time to amend has long passed. Thus, the Court considers only the Bonita Bay Employment Agreement.

Lee Health argues, in part, that the breach of contract claim fails because Lee Health could terminate the contract without cause with 90-days' notice, which is what it did. (Doc. 59-5, at ¶ 10.b). Callaway failed to respond to this argument.

Lee Health terminated the contract on October 6, 2017, which was over 90 days before the end of January 2018, when she was to begin employment.

As a result, the termination of the contract was within the 90-day window to terminate without cause and thus was not a breach of the contract.

Accordingly, it is now

**ORDERED:**

Defendant's Motion for Summary Judgment (Doc. 56) is **GRANTED**. The Clerk is **directed** to enter judgment for Defendant and against Plaintiff, terminate all pending motions and deadlines, and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida on January 10, 2022.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record